PABST BREWING COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION et al. (James Randolph, Appellee).

Third District (Industrial Commission Division) Nos. 3—87—0462WC, 3—87—0501 cons.

Opinion filed April 8, 1988.

Robert H. Jennetten and Dianne M. Wolfe, both of Quinn, Johnston, Henderson & Pretorius, Chartered, of Peoria, for appellant.

John Lesaganich, of Goldfine & Bowles, of Peoria, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Claimant, James Randolph, filed an application for adjustment of claim under the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*) for a work-related injury which occurred on March 31, 1978. On August 1, 1979, the arbitrator found claimant was permanently and totally disabled under the Act and was entitled to $728 for reasonable and necessary medical expenses. Respondent appealed the arbitrator's decision and the Industrial Commission (Commission) found on July 9, 1980, that claimant was temporarily totally disabled to February 28, 1980, for a period of 99⁶/₇ weeks and that he was entitled to $728 for necessary and reasonable medical costs and rehabilitation services.

Claimant then sought additional temporary total disability on May 31, 1983. The arbitrator found that claimant was temporarily totally disabled for a period of 159 weeks and was entitled to $1,668.74 for reasonable and necessary medical expenses. The Commission modified the arbitrator's decision and found that claimant was temporarily totally disabled to November 19, 1980, and from March 10 to March 12, 1982, and was entitled to $1,668.74 for medical expenses.

The circuit court of Peoria County set aside the Commission's decision and on remand directed the Commission to award claimant temporary total disability payments accruing from February 29, 1980, to March 12, 1982. The Commission did so, and this appeal followed.

Respondent's primary argument is that the circuit court's decision to set aside the Commission's finding is against the manifest weight of the evidence. Respondent also contends that the assessment of the extent of temporary total disability is within the Commission's discretion and expertise and, also, that the Commission was in the best position to judge the witnesses' credibility. Discussion of these final two contentions will be subsumed in the discussion of the principal issue.

A recitation of the relevant facts is helpful at this point. On March 31, 1978, claimant, while working for the respondent, bent down to remove a can from a conveyor belt and, upon straightening up, felt a searing pain in his back. Claimant was subsequently hospitalized several times for lower back pain and underwent a laminectomy, performed by Dr. Jesse Weinger, in July 1978.

Claimant sought further care from Dr. Weinger on February 28, 1980, and on May 19, 1980. Claimant had previously been seen by Dr. Weinger on July 5, 1979, and at that time, it was the opinion of Dr. Weinger that claimant "should be on permanent disability." On May 19, 1980, Dr. Weinger recommended that claimant obtain a Raney brace to see if it might relieve some of his symptoms and facilitate the evaluation of a possible spinal fusion. In his report to respondent dated June 2, 1982, Dr. Weinger stated that "he [claimant] did not know at that time [May 19, 1980] whether he wanted to wear a brace and I told him that if not, he should just see me in follow-up in six months."

Claimant testified that he did not recall Dr. Weinger telling him to return in six months after the May 19, 1980, examination. There are no pertinent medical records that shed any light on the disputed instruction. Claimant stated that he submitted a requisition to respondent requesting money to buy the Raney brace, which costs between $600 and $700. The respondent evidently refused this request.

Claimant did not see Dr. Weinger again until February 18, 1982. Claimant testified that in the interim his condition steadily deteriorated and that he had not sought any medical treatment. Claimant stated that in 1981, he found it increasingly difficult to get up the three flights of stairs to his apartment and began having other people do his housekeeping.

At his doctor's appointment on February 18, 1982, claimant told Dr. Weinger that his condition was getting worse. Claimant complained of pain in his lower back radiating into the left leg.

Dr. Weinger admitted claimant to the Methodist Medical Center on March 10, 1982, for a battery of tests. In the June 2, 1982, letter to respondent, Dr. Weinger stated, "the patient had a lumbar myelogram performed which was normal, and he also had a negative bone scan. It was felt that the patient's complaints were of a functional nature, and there was [sic] no objective findings to substantiate any significant disability. I felt that further treatment or evaluation was not indicated, and the patient was reassured that there was no serious problem and was discharged to his prior activity with no specific limitations."

On an X-ray report written by Dr. C. A. Fenton and dated March 11, 1982, Dr. Fenton's diagnosis was a "possible herniated disc." Under his analysis of the myelogram results, he wrote that his impression was a "[d]egenerative bulge between L4—L5, unchanged since 6/22/78." (Claimant underwent surgery for a laminectomy in July 1978.) Further, he stated:

> "This study was compared to the study of 6/22/78 from which there is little interval change. Again is seen an anterior bulge on the *Amipaque* [*sic*] column between L4—L5 representing a degenerative bulge."

At his attorney's request, claimant was seen by Dr. Gordon Schultz on October 28, 1982. In his evidence deposition, Dr. Schultz, a board-certified orthopedic surgeon, testified as to the following results and observations arising from the examination. Dr. Schultz noted that claimant had great difficulty undressing. Claimant had an L—5 sensory loss on the right side and that the L—5 nerve root on the medial side of his foot and demonstrated decreased sensation.

Dr. Schultz also noted that "[w]hen I asked him to lie down from a sitting position, he did this on his right side, then rolled over on his back, and only severely disabled people do that." He then attempted to get some passive movement of claimant's lumbar spine but was unable to do so because the muscle pain and spasm in the lower back. Dr. Schultz noted that claimant had the appearance of a reversed lumbar lordosis, *i.e.*, the lower back was curved outward due to muscle spasm.

Dr. Schultz also detected a severe hamstring spasm. He noted that a malingerer would not be able to feign the symptoms of a hamstring spasm. Dr. Schultz diagnosed claimant's condition as a "post laminectomy syndrome, which," he explained, "was a set of complaints that follow a laminectomy that doesn't improve as they [*sic*] should." He characterized the degree of claimant's post laminectomy syndrome as exceedingly severe.

Regarding whether claimant's symptoms were functional rather than organic, Dr. Schultz stated, "His muscle spasm was the same with him standing, sitting, and lying down. The inability to bend when he was standing, the inability to carry out straight leg raising test, and the muscle spasm carried out with him sitting were all equal. And if it was a functional problem, they wouldn't have been equal." He opined that claimant's physical problem were organically based and that claimant was not a malinger.

On cross-examination, Dr. Schultz stated that claimant's subjective complaints of pain did not serve as the basis for his diagnosis,

which was based on his objective findings.

█ It is axiomatic that a reviewing court will not disturb the Commission's decision unless it is against the manifest weight of the evidence. (*Luckenbill v. Industrial Comm'n* (1987), 155 Ill. App. 3d 106.) However, a reviewing court must weight and consider the evidence, and if the Commission's decision is against the manifest weight of the evidence, the court is obligated to set the decision aside. *Luckenbill*, 155 Ill. App. 3d at 111.

█ Respondent argues that there is ample evidence in the record to support the Commission's decision. We disagree. Respondent stresses that on May 19, 1980, Dr. Weinger advised claimant to return for a follow-up visit in six months and that claimant did not do so. The record does not specifically support that assertion. Claimant testified that Dr. Weinger did not tell him to come back in six months. In the record, there are no physician's notes verifying that Dr. Weinger directed claimant to come for a six–month follow-up examination. The only evidence reflecting that such a six-month examination was set up is ambiguous at best. In a June 2, 1982, letter to respondent's attorney, Dr. Weinger wrote, "He [claimant] did not know at that time [May 19, 1980] whether he wanted to wear a brace and I told him that if not, he should just see me in follow up in six months." This is not conclusive evidence that claimant was on notice of the necessity of a follow-up examination.

Respondent further argues that the findings of claimant's medical work up from March 10 to March 12, 1982, were all normal and, therefore, supported Dr. Weinger's assertions that claimant had a "hysteric type of resistance and not a true organic problem." The report of Dr. Fenton, noted above, was based on X rays taken during this testing period and those taken in June 1978, prior to claimant's laminectomy. Dr. Fenton's impression from reviewing the X rays is that claimant had a "possible herniated disc." His interpretation of the myelogram results indicated a "[d]egenerative bulge between L4– L5 ***. *** Again is seen an anterior bulge on the *Amipaque* [*sic*] column between L4—L5 representing a degenerative bulge."

These statements undercut Dr. Weinger's assertion that there was no objective basis for claimant's continuing complaint. Of further importance is the contradiction between his statement on July 5, 1979, that claimant "should be on permanent disability" and his June 2, 1982, opinion that there was no organic basis for claimant's pain.

Respondent seeks to downplay the testimony of Dr. Schultz by ignoring the fact that he extensively tested for and objectively discovered the muscle spasms. In light of Dr. Schultz' finding that claimant

did have severe muscle spasms in his lower back and left hamstring muscle, Dr. Weinger's dismissal of claimant's back pain as hysterical in nature is not compelling. The evidence in support of claimant, *i.e.*, his own testimony, the report of Dr. Fenton, and the testimony of Dr. Schultz, *clearly* outweighs that which supports respondent's position, namely, the letter of Dr. Weinger dated June 2, 1982.

We find that the Commission's decision is against the manifest weight of the evidence and must be reversed. (*Oros v. Industrial Comm'n* (1967), 37 Ill. 2d 568.) We affirm the ruling of the circuit court of Peoria County setting aside the Commission's decision in this case.

Affirmed.

BARRY, P.J., and McCULLOUGH, McNAMARA, and CALVO, JJ., concur.